UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| SHAKARA M. THOMPSON and JONATHAN HARRISON,<br><br>Plaintiffs<br><br>v.<br><br>WELLS FARGO BANK, N.A., and DOES 1 through 100,<br><br>Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>Civil Action No. 3:20-cv-136 |

Plaintiffs, Shakara M. Thompson ("Thompson") and Jonathan Harrison ("Harrison"), hereby complain and allege against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") the following:

**INTRODUCTION**

1. Plaintiff Harrison brings this action against Defendant for sexual harassment and retaliation for complaining about said sexual harassment, up to and including termination, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et. seq.*, Family and Medical Leave Act of 1993 ("FMLA") 29 U.S.C. § 2601 and Wrongful Discharge in Violation of North Carolina public policy.

1

2. Plaintiff Thompson brings this action against Defendant for retaliation for participating in the investigation of the sexual harassment about co-Plaintiff Jonathan Harrison and acting as a witness for him, all in violation of Title VII.

## THE PARTIES

3. Jonathan Harrison is a male citizen and resident of Charlotte, North Carolina.

4. Shakara M. Thompson is a female citizen and resident of Charlotte, North Carolina.

5. Defendant Wells Fargo Bank, National Association is a national banking association, with a place of business, and therefore residence and citizenship, being Charlotte, Mecklenburg County, North Carolina.

6. Plaintiffs are informed and believe, and based upon such information and belief allege, that the Defendants, and each of them, are now and/or at all times mentioned in this Complaint were in some manner legally responsible for the events, happenings, and circumstances alleged in this Complaint.

7. Plaintiffs are further informed and believe, and based upon such information and belief allege, that at all times mentioned, all Defendants, and each of them, were and are the agents, servants, employees, joint venturers, alter egos, and/or partners of each of the other Defendants, and were, at all such times, acting within the course and scope of said employment and/or agency; furthermore, that each and every Defendant herein, while acting as a high corporate officer, director, and/or managing agent, principal, and/or employer, expressly directed, consented to, approved, affirmed, and ratified each and every action taken by the other co-Defendants, as herein alleged and was responsible in whole or in part for the matters referred to herein.

8. Plaintiffs are further informed and believe, and based upon such information and belief allege, that at all times herein mentioned, Defendants, and each of them, proximately caused Plaintiff to be subjected to the unlawful practices, wrongs, complaints, injuries and/or damages alleged in this Complaint.

9. Plaintiffs are further informed and believe, and based upon such information and belief allege, that Defendants, and each of them, are now and/or at all times mentioned in this Complaint were members of and/or engaged in a joint venture, partnership and common enterprise, and were acting within the course and scope of, and in pursuit of said joint venture, partnership and common enterprise and, as such were co-employers of Plaintiffs.

10. Plaintiffs are further informed and believe, and based upon such information and belief allege, that Defendants, and each of them, at all times mentioned in this Complaint, concurred with, contributed to, approved of, aided and abetted, condoned and/or otherwise ratified, the various acts and omissions of each and every one of the other Defendants in proximately causing the injuries and/or damages alleged in this Complaint.

## JURISDICTION AND VENUE

11. This action arises under federal statutes including Title VII. This Court has jurisdiction over this matter pursuant to 42 U.S.C.§2000e *et. seq.* and the FMLA, because the claims brought herein constitute a federal question under the laws of the United States. In the alternative, this Court has diversity jurisdiction under 28 U.S.C. § 1332, because the parties are citizens of different states and the matter in controversy exceeds $75,000.00.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Plaintiffs were hired to work in this District and Defendant conducts business in this District.

## COVERAGE ALLEGATIONS

13. At all times relevant to this action, Plaintiffs were "employees" covered by the protections of Title VII of the Civil Rights Act of 1964 within the meaning of 42 U.S.C. § 2000e(f).

14. At all times relevant to this action, Plaintiff Harrison was an "employee" with the definition of FMLA, 29 U.S.C. § 2611(2)(A), on the basis that Wells Fargo employed Harrison for least 12 months, and Harrison performed at least 1,250 hours of service for Wells Fargo during the 12-month period preceding the termination of his employment.

15. At all relevant times herein, Defendants employed at least 15 employees at all relevant times and is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

16. At all times hereinafter mentioned, Defendants have been an employer within the meaning of FMLA, 29 U.S.C. § 2611(4)(A) on the basis that it employs more than 50 employees.

17. At all times hereinafter mentioned, Defendants have been an employer within the meaning of Section 95-25.2(5) of the NCWHA, N.C. Gen. Stat. §§ 95-25.2(5).

18. At all times hereinafter mentioned, Plaintiffs were employees within the meaning of Section 95-25.2(4) of the NCWHA, N.C. Gen. Stat. §§ 95-25.2(4).

## ADMINISTRATIVE EXHAUSTION

19. Plaintiffs satisfied their obligations to exhaust their administrative remedies by timely filing Charges of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging retaliation.

20. On December 20, 2019, the EEOC issued a Notice of Suit Rights to Thompson and she timely brings this action within ninety (90) days of her receipt thereof.

21. On December 4, 2019, the EEOC issued a Notice of Suit Rights to Harrison and he timely brings this action within ninety (90) days of his receipt thereof.

22. Plaintiffs have satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## FACTS

**Employment History of Thompson and Harrison**

23. Plaintiff Jonathan Harrison began working for Wells Fargo on March 31, 2016 as a Financial Crimes Specialist II, Call Center. He remained working at this level until he was terminated on November 15, 2019.

24. Plaintiff Shakara Thompson began working for Wells Fargo on or about October 12, 2015 as a Financial Crimes Specialist 2. She is currently a Financial Crimes Specialist 3.

25. Thompson has always been an exemplary employee with no record of discipline or poor performance prior to the retaliation described herein.

26. Beginning in December of 2017, both Harrison and Thompson reported to Manager Charlene Alexander ("Alexander").

27. At all relevant times, Harrison and Thompson were co-workers and workplace friends.

**Sexual Harassment and Retaliation by Alexander**

28. On or about October 15, 2018, Harrison was in the hallway on his way to the restroom when he encountered several female employees and Alexander screaming about a spider. Alexander asked Harrison to kill the spider and after he did, she patted him on the rear end in front of the other employees and said "good job." Harrison was very

5

Case 3:20-cv-00136-FDW   Document 1   Filed 03/03/20   Page 5 of 20

21. On December 4, 2019, the EEOC issued a Notice of Suit Rights to Harrison and he timely brings this action within ninety (90) days of his receipt thereof.

22. Plaintiffs have satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## FACTS

**Employment History of Thompson and Harrison**

23. Plaintiff Jonathan Harrison began working for Wells Fargo on March 31, 2016 as a Financial Crimes Specialist II, Call Center. He remained working at this level until he was terminated on November 15, 2019.

24. Plaintiff Shakara Thompson began working for Wells Fargo on or about October 12, 2015 as a Financial Crimes Specialist 2. She is currently a Financial Crimes Specialist 3.

25. Thompson has always been an exemplary employee with no record of discipline or poor performance prior to the retaliation described herein.

26. Beginning in December of 2017, both Harrison and Thompson reported to Manager Charlene Alexander ("Alexander").

27. At all relevant times, Harrison and Thompson were co-workers and workplace friends.

**Sexual Harassment and Retaliation by Alexander**

28. On or about October 15, 2018, Harrison was in the hallway on his way to the restroom when he encountered several female employees and Alexander screaming about a spider. Alexander asked Harrison to kill the spider and after he did, she patted him on the rear end in front of the other employees and said "good job." Harrison was very

uncomfortable by this touching of an intimate body part, particularly in front of other employees.

29. Thompson arrived in the hallway just before Harrison killed the spider and she witnessed the touching. Thompson was visibly shocked by the touching of Harrison's intimate body part in the workplace and Harrison asked her if she saw what happened and when she replied that she did, he told her how uncomfortable it made him feel. Thompson responded that she could imagine.

30. A few weeks later, during the first week of November of 2018, at about 5:30 pm, Alexander pulled Harrison off a telephone call and instructed him to come to the hallway because she was leaving for the day. Harrison was nervous because Alexander was the site leader and he was worried he did something wrong.

31. Once in the hallway, Alexander asked him, "what do you have down there in your pants?" Harrison was shocked and speechless because the question came out of nowhere.

32. Alexander then asked him if he would like to "get head" in the parking lot. Harrison thought he heard her incorrectly and Alexander repeated the question. Harrison told her he does not do things like that and told her to have a good day and returned to his desk.

33. After that day, Alexander repeatedly told Harrison to come back to her desk and visit her and have small talk. Harrison would say yes, but did not ever go. Alexander would go out of her way to walk past Harrison's desk every morning to talk to him, even though she did not need to go that route to get to her desk.

34. Harrison began to feel increasingly uncomfortable and asked his more immediate supervisor, Amy Baker, if he could move his desk so he was no longer in the back area with her. She refused and told him there would be a desk change at the beginning of the year.

6

Harrison asked again a few weeks later because he noticed several empty desks. He told Baker he felt uncomfortable and could not focus in the back. Again she refused to move his desk.

35. On or about November 11, 2018, Harrison was just about to go on his break with Thompson to get coffee. Alexander had just arrived at work and as she walked past she said, "I need you two to come to my desk." She did not say anything else to them and appeared to be furious.

36. Once at her desk, Alexander told them she hated seeing them together and that it aggravates her. She was staring harshly at Harrison the entire time and spoke loudly and angrily.

37. Alexander then turned to Thompson and said "I never, ever want you to be at his desk again." She said to Harrison, "If you want to be around her then stay out of my sight and go in the hall." Alexander then turned back to her computer and did not allow Thompson or Harrison to speak. She did not speak to them much after that for a few weeks.

38. Harrison and Thompson tried to follow her orders and keep their distance from each other around Alexander. A few weeks later, Alexander came to Harrison and said, "Thank you for handling that." She thereafter acted happy with him and started speaking to him again.

39. The following month, on or about December 13, 2018, Harrison was at a team pot luck sitting with his co-workers. Alexander came in, got food and was about to leave when she saw Harrison. She came straight to his table and sat down. She began sharing with him personal details about her recent engagement and that she was having second thoughts about

7

marrying her fiance. She spoke only to Harrison, even though he was sitting at the table with his whole team.

40. The sexual harassment took its toll on Harrison. Alexander's treatment of him caused him extreme stress and was working each day under duress. Sometimes, he used his PTO time just to avoid her and get a break from her and the environment she created for him at work.

41. Harrison suffered daily but was afraid to report Alexander because he had a family to support and he was afraid of losing his job if he complained.

**Investigation of Sexual Harassment by Alexander**

42. On January 15, 2019, the work environment became so stressful that he complained to Julie Hedges, Wells Fargo's Employee Relations Sr. Consultant. His complaint letter identified Thompson as a percipient witness and target of Alexander's hostility.

43. Wells Fargo thereafter conducted an investigation during which both Thompson and Harrison were interviewed. Ultimately, Wells Fargo determined that Alexander's sexual harassment and retaliation were so egregious that termination was warranted.

44. Wells Fargo replaced Alexander by Corey McGriff, a substitute, temporary Site Leader.

45. Wells Fargo did not send out any formal email or otherwise notify employees of Alexander's termination, yet all supervisors and staff knew her termination was related to Harrison's sexual harassment complaint and knew details of the investigation, such as Thompson's involvement.

46. Several supervisors, who were friends with Alexander, expressed to their teams that Alexander was wrongfully terminated. They also informed their teams and other staff members that the wrongful termination was because of Harrison and Thompson.

**Retaliation of Harrison by Wells Fargo**

47. After Alexander was terminated, Harrison continued to be subjected to a hostile work environment as co-workers and supervisors treated him like an outcast, ignoring him and refusing to engage or interact with him.

48. Rumors were spread about the termination of Alexander and confidential information related to the investigation was disclosed to other employees. On information and belief, the source of the rumors and disclosures was a supervisor in a leadership position, Derrick Brown.

49. On or about April 19, 2019, Harrison was issued a write-up by his supervisor, Livinski Plaskett for being away from his desk and in "After Call" mode. However, when Plaskett questioned Harrison at the time, Harrison explained that he did not correctly log out due to a new phone system. He also explained to Plaskett that he was leaving early due to his FMLA leave allowance due to an existing medical condition. Livinsky wrote Harrison up despite his explanation regarding his FMLA leave.

50. Harrison was summoned to meet with Levinsky and the Interim Site Leader, Corey McGriff, regarding the write-up. The meeting took place in a storage closet. There was no place for Harrison to even sit. At the meeting Harrison explained that he told Livinsky he was taking FMLA leave but Levisky denied receiving this information.

51. On or about July 9, 2019, Harrison received a "Record of Conversation" for an event that is a frequent occurrence and does not result in any adverse consequences.

52. On that date was summoned to meet with his supervisor, Amy Baker. The meetings are automatically scheduled twice per month by a computer program. They are simply a check in with the supervisor with no particular agenda or specific purpose. Often, the discussion is more about personal matters unrelated to work. Just a little face-time between the team member and supervisor.

53. When the July 9 meeting time arose, Harrison indicated to Baker that he wanted to continue to work to improve his call metrics. It is very common among Harrison's team members to miss a one-on-one meeting with a supervisor and missing such meetings does not result in trigger write-ups or discipline.

54. Some team members miss the meeting regularly without repercussions. Harrision has missed approximately 10 such meetings in his three years of employment and never received a write-up, warning or corrective action for it.

57. When Harrison declined the July 9 meeting so he could continue working, Baker set up another meeting with Harrison, this time to be attended by McGriff as well. Baker sent Harrison an instant message directing her to meet her and McGriff in a separate room. Harrison responded that they could meet with him at his desk and that he felt more comfortable that way.

55. Harrison did not refuse to meet with Baker and McGriff, he simply requested the meeting not take place in a separate room. After the sexual harassment by Alexander, Harrison was always required to meet with supervisors in a separate room, like the storage closet, behind closed doors.

56. Forcing him to meet in storage closets and other rooms was humiliating and degrading and further alienated him from his co-workers, who were not subjected to such

treatment. Other team members met with supervisors for their one-on-one meetings and other meetings either at their own desk or the supervisor's desk.

57. Harrison was the only employee forced to meet in storage closets and other rooms in the building. Harrison believed and believes it was part of the retaliation and continued hostile work environment to single him out and meet with him behind closed doors only. This is the only reason he requested a meeting, like his co-workers enjoy, at his own desk. Despite his very clear explanation and request, Harrison was written up for refusing to meet with Baker and McGriff.

58. The following day, on July 19, 2019, Harrison was on break and standing in front of his desk in his cubicle talking to a coworker. Another supervisor, LaToya Mayberry, asked if he was on break and he replied he was on lunch. She told him to have a seat down in his seat.

59. When team members are in their cubicle, they may stand or sit. At the time Mayberry told him to sit down, he was about to leave for lunch and thus was standing. Harrison thus questioned Mayberry why she was telling him he must sit down.

60. In order to walk all the way over to Harrison to specifically tell him to sit down, Mayberry walked past several desks where team members and co-workers were gathering and talking. She said nothing to them and they continued standing, talking and gathering even after Mayberry told Harrison to sit down.

61. When Harrison questioned Mayberry, she indicated she was going to report the incident to his supervisor.

62. On July 29, 2019, Harrison was issued an "Informal Warning" by McGriff based on the missed check-in on July 9 and his decision not to meet with Baker and McGriff behind

11

closed doors. The Informal Warning incorrectly reports that Harrison refused to meet with them, which is further retaliation.

63. Dealing with the stress from the hostile work environment has caused Harrison to suffer certain health conditions that caused him to increase the FMLA hours needed to deal with the physical and mental stress.

64. After three years of working for Wells Fargo, Harrison was never promoted and remained in the same job at the same level. Everyone else on his team has been promoted to Financial Crimes Specialist 3, which he is still at a level 2.

65. Harrison should have been offered the opportunity to "upskill" by taking additional training classes, and although he was eligible for it, Wells Fargo refused to offer it to him. He is the only member of his team who remains not skilled. A team member who was on a corrective action plan was permitted to upskill.

66. On or about, August 1, 2019, Harrison filed an EEOC charge for retaliation based on the foregoing events. Wells Fargo filed its position statement on _____.

67. The retaliation and alienation of Harrison continued after the EEOC charge was filed.

68. He has never received any step up in pay either. The entire team went to a community service event, which Harrison asked Baker if he could also attend. Baker told him he would have ask McGriff, and McGriff refused to allow Harrison to attend.

69. Although the EEOC charge apparently prompted Wells Fargo to finally offer Harrison the opportunity to upskill, it then terminated Harrison before he had the opportunity to do so.

**Violation of Harrison's FMLA rights by Wells Fargo**

70. After being sexually harassed by Alexander and ostracized at work, Harrison became very stressed and received medical treatment. His physician approved 24 hours of FMLA leave per month in February of 2019.

71. Harrison's FMLA leave allowance was increased to 32 hours per month in March of 2019. He also could go over the allotment by one day per month.

72. Wells Fargo repeatedly interfered with his FMLA leave and retaliated against him for taking FMLA leave.

73. As alleged above, Harrison was written up in April of 2019, Harrison was written up for being away from his desk even though he was using his FMLA leave and explained that to his supervisor.

74. After Harrison filed his EEOC charge in August of 2019 and Wells Fargo began investigating the charge in mid-August, Baker stopped entering Harrison's FMLA leave in the system, making it appear that he had excessive absences and an attendance problem. The last date she entered FMLA leave time was August 12, 2019.

75. Baker acted in retaliation and interfered with Harrison's FMLA rights.

76. On or about November 15, 2019, McGriff called Harrison to a meeting in a separate room in the building. Baker did not attend.

77. McGriff told Harrison he was being terminated Harrison for attendance problems. Harrison reminded McGriff that he had FMLA leave and that Baker must not be entering his FMLA leave in the system properly.

78. McGriff did not confirm with Baker about the FMLA leave. Instead, he terminated Harrison anyway.

79. At the time he was terminated, Harrison had 259.30 minutes of FMLA leave remaining for the month. Baker had not entered his FMLA time since August of 2019.

**Retaliation by Wells Fargo against Thompson**

80. After Alexander was terminated, Thompson was approached by at least one supervisor who told her she heard Thompson's name mentioned regarding the reason Alexander was terminated.

81. Following the termination of the supervisor, Thompson's new supervisor who was close with Alexander, began repeatedly telling her that she should look for another job.

82. The constant gossip and ill will directed at Thompson and Harrison created a hostile work environment. All supervisors were friends with Alexander and they stopped speaking to and interacting with Thompson and Harrison after Alexander was terminated.

83. The stress from the gossip and tension created by supervisors resulted in Thompson taking sick leave and going out on short term disability in April of 2019 and from October 2019 to November 6, 2019. She was so stressed in October of 2019 that she was hospitalized and needed a blood transfusion.

84. On July 22, 2019, Daisy Robinson issued an Informal Warning to Thompson, dated July 19, 2019. The informal warning stated that, "On 7/15/2019, you failed to meet these expectations as follows: . . ." The warning then lists four dates on which Thompson purported failed to meet certain expectations, with the earliest dating back to December of 2018. The other failures purportedly occurred in April, May and June of 2019.

85. The December 2018 alleged failure for Customer Experience is incorrect because Thompson scored a 3.75 and above a 3.00 is considered "meeting" the metric.

86. The April 2019 alleged failure was incorrect because Thompson had just left training and was on Short Term Disability most of April. She only worked four days in April. In fact, Wells Fargo was required to concede that the April 2019 "failure" identified by Robinson was entirely erroneous. Thompson had been learning a new skill set and was within the 60-day grace period allowed for the employee to become accustomed to the new information, during which time they would not be held accountable for meeting the metrics of the new skill.

87. Wells Fargo's only explanation for the erroneous warning was Robinson's lack of understanding about the procedures and process of team member training. Although it rescinded the April 2019 item on the Informal Warning, the other warnings remain intact.

88. Thompson did not receive any documented coaching or records of conversation related to these purported failures to meet metrics. Robinson went directly to the Informal Warning.

89. A week after Thompson received her Informal Warning, Manager Amy Baker issued an Informal Warning to Harrison, also in retaliation for complaining about Alexander's sexual harassment, but stating reasons that were purely, or substantially, pretextual.

**FIRST CLAIM FOR RELIEF**
**(Sexual Harassment - Violation of Title VII of the**
**Civil Rights Act of 1964 - as amended)**
**(By Plaintiff Harrison)**

90. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

91. In doing the acts alleged above, Wells Fargo subjected Harrison to sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*.

92. Alexander made sexually inappropriate and harassing comments and physically touched Harrison's intimate body parts in a way that a reasonable person would find hostile and abusive, which were offensive to Harrison and which he deemed to be sexually harassing.

93. Alexander's sexually inappropriate comments and touching were unwelcome.

94. Upon information and belief, Wells Fargo knew or should have known of Alexander's propensity for inappropriate conduct, including but not limited to the sexual harassment of Harrison, and failed to take the necessary steps to prevent such harmful misconduct before it occurred.

95. As a direct result of said conduct, Harrison has suffered lost past and future wages and job benefits and has suffered and will continue to suffer emotional pain, suffering, inconvenience, embarrassment, mental anguish, and other non-pecuniary losses in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Retaliation for Opposing Violations of Title VII of the**
**Civil Rights Act of 1964 - as amended)**
**(By Plaintiff Harrison)**

96. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

97. In doing the acts alleged herein, Wells Fargo retaliated against Harrison in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*.

98. Harrison was engaged in the protected activity of reasonably opposing practices he reasonably believed constituted unlawful discrimination and/or sexual harassment on the basis of sex.

16

99. Harrison genuinely believed that Wells Fargo was discriminating based on sex and/or engaging in sexual harassment, and his belief was reasonable.

100. Wells Fargo was aware that Harrison was engaged in a protected activity.

101. Wells Fargo took adverse employment actions against Harrison, including but not limited to, writing him up, failing to promote and/or train him, creating a hostile work environment for him and then terminating him.

102. The adverse employment actions taken by Wells Fargo were causally and temporally linked to Harrison's engagement in protected activity.

103. As a direct result of said conduct, Harrison has suffered lost past and future wages and job benefits and has suffered and will continue to suffer emotional pain, suffering, inconvenience, embarrassment, mental anguish, and other non-pecuniary losses in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Violation of FMLA – Interference with FMLA Rights)
### (By Plaintiff Harrison)

104. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

105. In doing the acts alleged herein, Wells Fargo violated the FMLA by preventing Harrison from taking his lawfully permitted FMLA leave under 29 U.S.C. § 2612.

106. In doing the acts alleged herein, Wells Fargo denied, interfered with, and restrained Harrison from the lawful exercise of his substantive rights provided under the FMLA including, but not limited to, requiring Harrison to work after he requested FMLA leave, denying his request for FMLA leave, and failing to provide him notice and an opportunity to cure any deficiencies in his documents requesting FMLA leave.

107. Harrison has suffered damages because of Wells Fargo's unlawful conduct violating the FMLA.

108. Wells Fargo's violation of the FMLA, 29 U.S.C. § 2615(a)(1), by interfering with Harrison's lawful exercise of his rights under FMLA, was willful and/or lacking of good faith.

**FOURTH CLAIM FOR RELIEF**
**(Violation of FMLA - Retaliation)**
**(By Plaintiff Harrison)**

109. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

110. In doing the acts alleged herein, Wells Fargo unlawfully reprimanded, disciplined, failed to promote and train, and ultimately terminated in retaliation for taking his lawfully permitted FMLA leave.

111. Harrison engaged in protected activity by taking and requesting FMLA leave.

112. Wells Fargo took an adverse action against Harrison by unlawfully terminating him because he exercised his rights to take protected FMLA leave.

113. Wells Fargo's adverse employment action was causally connected to Harrison's protected activity, as shown by the proximity in time between the protected FMLA leave and his termination.

114. Harrison has suffered damages because of Wells Fargo's unlawful conduct.

115. Wells Fargo's violation of the FMLA, 29 U.S.C. § 2615(a)(2), by discriminating and retaliating against Harrision because he engaged in protected activity under the FMLA, was willful and/or lacking of good faith.

## THIRD CLAIM FOR RELIEF
### (Retaliation for Opposing Violations of Title VII of the Civil Rights Act of 1964 - as amended)
### (By Plaintiff Thompson)

116. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

117. In doing the acts alleged herein, Wells Fargo retaliated against Thompson in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*.

118. Thompson was engaged in the protected activity of reasonably opposing practices she reasonably believed constituted unlawful discrimination and/or sexual harassment on the basis of sex.

119. Thompson genuinely believed that Wells Fargo was discriminating based on sex and/or engaging in sexual harassment, and her belief was reasonable.

120. Wells Fargo was aware that Thompson was engaged in a protected activity.

121. Wells Fargo took adverse employment actions against Thompson, including but not limited to, writing her up, docking her pay, telling her to look for another job and creating a hostile work environment for her.

122. The adverse employment actions taken by Wells Fargo were causally and temporally linked to Thompson's engagement in protected activity.

123. As a direct result of said conduct, Thompson has suffered lost past and future wages and job benefits and has suffered and will continue to suffer emotional pain, suffering, inconvenience, embarrassment, mental anguish, and other non-pecuniary losses in an amount to be determined at trial.

19

# PRAYER OR RELIEF

Wherefore, Plaintiffs Shakara M. Thompson and Jonathan Harrison respectfully requests that this Court enter judgment in their favor and grant them the following relief:

1. Enter a judgment against Defendants and order Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial;

2. Award Plaintiffs pre-judgment and post-judgment interest against Defendants;

3. Award Plaintiffs all reasonable costs and attorneys' fees incurred in connection with this action;

4. Award Plaintiff Thompson injunctive relief to prohibit unlawful conduct in the future; and

5. Award Plaintiffs such other and further equitable relief as the Court deems appropriate under the circumstances.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NC State Bar No. 26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Telephone: (704) 234-7442
E-Mail: michelle@mgessnerlaw.com

*Attorney for Plaintiffs*